## A11A1192. TURNER v. THE STATE.
### (720 SE2d 264)

DILLARD, Judge.

Cassandra Jill Turner pleaded guilty to three counts of theft by taking as a fiduciary[1] and was sentenced by the trial court as a first offender to serve 15 years, followed by 30 years on probation. Additionally, the trial court ordered that, as a term of her probation, Turner pay her former employer, Middle Georgia Management Services ("MGMS"), a total of $1,877,531.03 in restitution. Turner appeals the trial court's order of restitution, arguing that it erred by (1) failing to consider her current financial condition and future earning capacity; (2) failing to consider the factors required by OCGA § 17-14-10; (3) finding that the amount of the award was supported by a preponderance of the evidence; and (4) imposing the full amount of MGMS's loss upon her in light of the evidence presented regarding the involvement of a deceased co-conspirator.[2] For the reasons set forth infra, we vacate the trial court's judgment with regard to the total amount of the restitution award and remand the case with direction. We otherwise affirm the judgment in all other respects.

The record shows that MGMS is a loan-provider with 17 branches throughout Georgia. Turner became the manager at MGMS's Statesboro office in 2004, and her close friend, Barbara Morris, was employed at the same office as a customer-service representative. The Statesboro office was comprised of one part-time and three full-time employees, including Turner and Morris, who were responsible for handling the loan-making process.

In November 2008, auditors from Wells Fargo—with whom MGMS held a $10 million line of credit—conducted a semi-annual review and noticed discrepancies that were brought to the attention of Ricky Gay, an MGMS supervisor who oversaw operations at the Statesboro office and others. On December 2, 2008, Gay went to the Statesboro office to investigate an odd number of loans with resched-

---

[1] *See* OCGA § 16-8-2 ("A person commits the offense of theft by taking when he unlawfully takes or, being in lawful possession thereof, unlawfully appropriates any property of another with the intention of depriving him of the property, regardless of the manner in which it is taken or appropriated."). Three counts of theft by deception were nolle prossed.

[2] Turner withdrew a fifth enumeration of error in her reply brief.

uled payment-due dates. Gay discovered that, unbeknownst to him, the loans had been rescheduled using his password; thus, he began to check the documentation of the approximately 500 questionable accounts.

For the first few accounts, Gay was unable to locate required documents, so he asked Turner to assist him in this endeavor. But Gay was still unable to locate the necessary supporting documentation, including signed contracts and promissory notes. He then questioned Turner about the suspicious accounts, at which point she "immediately broke down and became almost hysterical," claiming that she had been unable to stop Morris from creating fake loans. Turner admitted to Gay that the questionable accounts were bogus and revealed that there were more. She then brought Gay a box filled with approximately 1,340 fake loans.

Shortly thereafter, Morris approached Gay in tears and also admitted to creating the fake loans, some of which were fabricated using the names and information of former MGMS clients. Turner then asked Gay if she could briefly leave the office to get something to settle her stomach, and Morris told Gay that she was going to step outside to call her daughter. Tragically, Morris instead drove home and committed suicide.

In the formal investigation that followed, the questionable loans were certified as fictitious, and Wells Fargo thereafter froze the company's line of credit, which nearly caused MGMS to go out of business, as it was forced to use outside sources for operating funds. In the end, MGMS's total loss resulting from the creation of the fictitious loans amounted to $1,883,542.59—a total which excluded the company's payment of monthly commissions and year-end bonuses that were artificially inflated due to the loan-scheme.[3]

Thereafter, Turner was indicted, pleaded guilty to the charges against her, and was brought before the trial court for a restitution hearing. At that hearing, Turner testified that she did not receive any of the missing $1.8 million, though she did acknowledge that a percentage of her commissions and year-end bonuses were attributable to the bogus loans.[4] Further, although Turner fully admitted to having knowledge of Morris's actions beginning in early 2007, she claimed that Morris threatened to commit suicide whenever con-

---

[3] It appears that MGMS employees who unknowingly benefitted from the bogus loans by way of commissions and bonuses were later docked in future bonus payments in order to repay the company.

[4] The evidence showed that before the loan-scheme began, Turner received $14,043.09 in commissions in 2005. But after the scheme began, she received total commission payments of $33,764.79 in 2006; $72,838.37 in 2007; and $34,900.77 in 2008. Turner also received a year-end bonus of $6,000 in 2005 but a bonus of $10,000 in 2006 and $16,000 in 2007.

fronted with her misdeeds.

The State's evidence corroborated that Turner had knowledge of the scheme but also undermined her claim of limited involvement. Indeed, the sole stockholder and owner of MGMS testified that it would have been impossible for Morris to have acted without Turner's knowledge, and Gay testified that all of the fake loans were coded and funded through a process that only Turner had the power to conduct. Additionally, the State presented evidence that, beginning in October 2006, the loans were created using computer-user identifications for both Morris *and* Turner, with an analysis showing a final total that attributed $508,938.32 to Morris and $1,374,604.27 to Turner.[5]

After a three-day hearing, the trial court ordered Turner to pay MGMS restitution in the amount of $1,877,531.03. This appeal by Turner follows.

1. Turner's first and second enumerations of error can be dispensed with in short order. In these enumerations, Turner argues that when the trial court ordered the restitution payment, it erred by failing to consider (1) her current financial condition and future earning capacity and (2) all of the factors in OCGA § 17-14-10. We disagree.

At the outset, we note that when a trial court or other ordering authority determines the nature and amount of restitution, it "shall" consider the following factors:

(1) [t]he financial resources and other assets of the offender or person ordered to pay restitution[,] including whether any of the assets are jointly controlled; (2) [t]he earnings and other income of the offender or person ordered to pay restitution; (3) [a]ny financial obligations of the offender or person ordered to pay restitution, including obligations to dependents; (4) [t]he amount of damages; (5) [t]he goal of restitution to the victim and the goal of rehabilitation of the offender; (6) [a]ny restitution previously made; (7) [t]he period of time during which the restitution order will be in effect; and (8) [o]ther factors which the ordering authority deems to be appropriate.[6]

And the record before us makes clear that the trial court was presented with evidence as to each of these factors.

In addition to the evidence discussed supra, the court was

---

[5] For her part, Turner presented testimony that it would have been possible for Morris to use Turner's computer identification to create fake loans—and vice versa.

[6] OCGA § 17-14-10 (a) (1)-(8).

presented with testimony by Turner and her husband regarding the assortment of odd jobs she had obtained since her dismissal from MGMS; her then-current salary of $10.50 per hour for 28 hours per week in a healthcare position; an estimate of what housing would cost should they lose their home in a pending bankruptcy case (which had allegedly prevented them from offering restitution); an estimate of the family's monthly expenses, including caring for two children, ages 11 and 9; and the economy's effect on her husband's salary.

Further, despite her admitted knowledge (and guilty plea to the charges), Turner attempted to show that the deceased Morris, whose income was less than Turner's, was living a lifestyle inconsistent with her salary,[7] leading to the inference that Morris had walked away with all or most of the missing $1.8 million. A number of witnesses testified regarding Morris's somewhat extravagant purchases; an alleged gambling problem; and large, frequent deposits into her accounts and the accounts of her family members in the years leading up to the discovery of the bogus loans.[8] Other witnesses testified regarding Turner's more financially conservative lifestyle and pending bankruptcy.

Nevertheless, the trial court was unpersuaded by the foregoing testimony. After hearing arguments by the State's prosecutor and Turner's counsel, the judge opined that what Turner had actually done was corroborate the State's evidence—namely that Morris received approximately $500,000 from the fake-loan enterprise, leaving the other $1.3 million attributable to Turner just as the computer-identification analysis had shown. The judge also expressed regret over the tragic nature of the case for the Turner family, the Morris family, and the families of the MGMS employees whose livelihoods were placed in jeopardy as a result of Turner and Morris's scheme.

In granting restitution, the judge deviated from the State's request for payments in one-thousand-dollar-a-month increments, believing this could not be met realistically. Instead, the judge ordered Turner to make payments in five-hundred-dollar-a-month increments. The judge also ordered that the amount of restitution be reduced by money obtained from other sources and acknowledged that the total amount would never be met unless the missing assets

---

[7] The evidence showed that Morris received a base salary of $1,600 per month with very little commission, resulting in an annual income of approximately $19,200. Turner, on the other hand, received a base salary of $2,200 per month with higher monthly commissions and a larger year-end bonus, resulting in an income that ranged from $60,514.16 in 2006 to $119,785.77 in 2007.

[8] Morris's children and the mother of her grandchild also took the stand but invoked the Fifth Amendment right against self-incrimination during questioning.

were located. On that issue, the judge expressed his opinion that credibility had been lacking in some testimony and that he believed the missing $1.3 million existed somewhere.[9] Finally, the judge sentenced Turner as a first offender with 15 years to serve, noting that "[i]n the interest of restitution, first offender would not only be a benefit to those that seek restitution but, as well, to the defendant."

Given the above-referenced evidence and the actions and comments by the trial court, Turner's argument that the court failed to consider all of the required factors, including her then-current and future financial position, is wholly without merit. The record clearly reflects the trial court's thoughtful consideration of the required factors.[10]

2. Turner further contends that the State failed to demonstrate the amount of restitution by a preponderance of the evidence. And on this particular point, we agree.

Pursuant to OCGA § 17-14-7, a dispute regarding the proper amount of restitution is resolved in the required hearing "by the preponderance of the evidence."[11] At this hearing, the State has the burden of demonstrating the amount of loss sustained by the victim, while the defendant has the burden of demonstrating his or her financial resources and the financial needs of any dependents.[12] Naturally, "[t]he amount of restitution ordered shall not exceed the

---

[9] The State then agreed that the restitution order could be amended at a later date if and when the missing assets were located.

[10] See Dorsey v. State, 206 Ga. App. 709, 715 (8) (426 SE2d 224) (1992) (holding that transcripts of hearing showed that trial court heard and considered evidence and argument regarding defendants' financial condition and adjusted restitution payment accordingly); see also McMahon v. State, 284 Ga. App. 192, 194 (2) (643 SE2d 236) (2007) (suggesting that court need not determine in advance that "the defendant's net worth or financial resources projected over the intended years of repayment" be "mathematically sufficient to allow full payment of the amount of restitution ordered"). Accord State v. Lohr, 125 P3d 977, 981 (B) (¶ 18) (Wash. Ct. App. 2005) ("Given that the court set the minimum monthly payment at an amount that would take over 400 years to pay off, it is evident the court considered [the defendant's] financial situation."). Compare Britt v. State, 232 Ga. App. 780, 781 (2) (503 SE2d 653) (1998) (noting that transcript indicated the trial court's failure to consider any factor aside from the amount of damages sustained by the victim); Pruitt v. State, 230 Ga. App. 334, 334 (1) (496 SE2d 324) (1998) (holding, under prior version of the statute requiring written findings of fact, that record revealed that trial court failed to consider all required factors, including specifically the defendant's financial condition at the time of sentencing); Baker v. State, 183 Ga. App. 100, 100 (357 SE2d 896) (1987) (State conceded that there was no restitution hearing and, thus, required factors were not considered and "no record was made . . . ensuring consideration of the factors").

[11] OCGA § 17-14-7 (b); see also OCGA § 24-1-1 (5) (" 'Preponderance of evidence' means that superior weight of evidence upon the issues involved, which, while not enough to free the mind wholly from a reasonable doubt, is yet sufficient to incline a reasonable and impartial mind to one side of the issue rather than to the other.").

[12] OCGA § 17-14-7 (b).

victim's damages."[13] And in this context, "damages" means

> all special damages which a victim could recover against an offender in a civil action . . . based on the same act or acts for which the offender is sentenced, except punitive damages and damages for pain and suffering, mental anguish, or loss of consortium. Such special damages shall not be limited by any law which may cap economic damages.[14]

Keeping in mind that written findings of fact are no longer required,[15] when this Court reviews a restitution order, we have "the duty of reviewing the transcript to determine whether each party has met his or her specified burden and determining whether a restitution award was supported by the preponderance of the evidence."[16] And our review of the record in the case sub judice reveals that at the end of the hearing, the court instructed the State to prepare an order reflecting an award of restitution in the amount of $1,883,542.59, plus accounting fees. Thereafter, the order prepared by the State and signed by the trial court directed that Turner "pay a total of $1,932,531.03 restitution, which includes [the] $1,883,542.59 monetary loss by [MGMS] and $48,988.44 for accounting/auditing/attorney fees associated with the theft by [Turner] and her co-conspirator Barbara Morris[,] who is deceased." That total was then reduced by $55,000 to account for payments received from an insurance policy,

---

[13] OCGA § 17-14-9.

[14] OCGA § 17-14-2 (2).

[15] The State cites *Adams v. State*, 291 Ga. App. 681 (662 SE2d 782) (2008), for the proposition that this Court must determine whether the trial court's restitution order is supported by a preponderance of the evidence. While this is a correct statement of law, *Adams* also *incorrectly* holds that the trial court must make written findings of fact when ordering restitution, a proposition that we overruled in *McCart v. State*, 289 Ga. App. 830, 831 (1) (658 SE2d 465) (2008), prior to deciding *Adams*. Although the parties take no issue with the trial court's lack of written findings, we take this opportunity to disapprove of *Adams* to the extent that it conflicts with *McCart*. See *McCart*, 289 Ga. App. at 832-33 (1) (holding that "*Garrett v. State* and its progeny are disapproved to the extent that they are authority for any cases involving restitution orders issued on or after July 1, 2005, the effective date of the Crime Victims Restitution Act of 2005," and that "[o]pinions in the appellate cases issued after that date, including cases involving restitution orders occurring prior to that date, are also disapproved to the extent that they require written findings when ordering an offender to make restitution" (footnote omitted)); *see also In the Interest of E. W.*, 290 Ga. App. 95, 96 (2) (658 SE2d 854) (2008) (recognizing that this Court in *McCart* "concluded that, due to changes in the relevant statutes, the ordering authority is no longer required to make written findings on the OCGA § 17-14-10 factors when ordering an offender to make restitution").

[16] *Mayfield v. State*, 307 Ga. App. 630, 630 (2) (705 SE2d 717) (2011) (citation and punctuation omitted); *see also McCart*, 289 Ga. App. at 832 (1) ("An appellate court is capable of reviewing a transcript to determine whether each party has met his or her specified burden and determining whether a restitution award was supported by the preponderance of the evidence."); *Williams v. State*, 247 Ga. App. 783, 785 (2) (b) (545 SE2d 343) (2001) ("This Court's review of evidence is limited to questions of sufficiency . . . ." (citation omitted)).

making $1,877,531.03 the final total to be repaid.

Although the State demonstrated the amount of money lost by MGMS through the creation of fake loans by a preponderance of the evidence (i.e., $1,883,542.59), the record does not contain sufficient evidence to support the additional $48,988.44 for "accounting/ auditing/attorney fees." Indeed, the record contains only a vague reference to accounting expenses during Gay's testimony, including mention of possibly having all associated bills faxed "at a later time." But nothing in the record before us supports or explains what is encompassed by the addition of $48,988.44 in "accounting/auditing/ attorney fees associated with the theft" to the restitution award.[17] Accordingly, we vacate the portion of the trial court's award that is unsupported by the record and remand for further proceedings consistent with this opinion.[18]

3. Finally, Turner contends that, due to Morris's involvement in the loan-scheme, the trial court erred in ordering that she be responsible for the entirety of the damages when it had the authority to apportion liability. We disagree.

OCGA § 17-14-7 provides that

> [i]f the ordering authority finds that more than one offender has contributed to the loss of a victim, the court *may* make each offender liable for payment of the full amount of restitution or *may* apportion liability among the offenders to reflect the level of contribution to the victim's loss and economic circumstances of each offender.[19]

Thus, although the trial court was permitted to apportion liability, it was not required to do so.[20]

As we have held in the past, the consideration of the factors in OCGA § 17-14-10 could, "in some situations, result in a determination that certain defendants should be liable for a greater share of the restitutionary amount."[21] And here, as discussed supra, the State presented evidence that Turner was personally responsible for

---

[17] *Compare Ezebuiro v. State*, 308 Ga. App. 282, 286 (2) (b) (707 SE2d 182) (2011) (holding that evidence at trial was sufficient to sustain full award of restitution); *Regent v. State*, 306 Ga. App. 616, 621 (3) (703 SE2d 81) (2010) (holding that "evidence of damages was sufficient and the amount of restitution did not exceed the victim's damages").

[18] *See generally Gray v. State*, 273 Ga. App. 747, 751 (2) (615 SE2d 834) (2005) ("[W]here we have found the restitution evidence insufficient to sustain the award, we have consistently remanded the case for a new restitution hearing." (citations omitted)).

[19] OCGA § 17-14-7 (c) (emphasis supplied).

[20] *See generally Jones v. State*, 246 Ga. App. 596, 598 (3) (539 SE2d 602) (2000) ("The word 'may' is permissive, rather than mandatory." (citation omitted)).

[21] *See Morrison v. State*, 181 Ga. App. 440, 442 (352 SE2d 622) (1987).

approximately $1.3 million of the total loss *and* that her participation was necessary to effectuate the *entire* scheme. Accordingly, Turner has not shown that it was error for the trial court to order her to pay the entire amount of MGMS's loss.[22]

*Judgment affirmed in part and vacated in part, and case remanded with direction. Mikell, C. J., Smith, P. J., Barnes, P. J., Miller, P. J., Phipps, P. J., Andrews, Ellington, Adams, Doyle, Blackwell and McFadden, JJ., concur.*

DECIDED NOVEMBER 22, 2011 — 

*Lovett Bennett, Jr.*, for appellant.

*Richard A. Mallard, District Attorney, Daphne H. Jarriel, Assistant District Attorney*, for appellee.

---

[22] *See id.* at 442 ("[D]efendant does not show that it would be error for the trial court to order one defendant to pay the entire restitutionary amount.").

