**FOURTH DIVISION**
**DOYLE, P. J.,**
**ANDREWS, P. J., and BOGGS, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**March 21, 2013**

# In the Court of Appeals of Georgia

A12A2170. WATTS v. THE STATE.

BOGGS, Judge.

Taryn Watts appeals from her convictions for simple assault and battery. She contends that the trial court erred by failing to merge her convictions; that the "[e]vidence was insufficient to prove beyond a reasonable doubt that [she] did not act in self-defense;" and that the trial court committed errors in its sentence. While we affirm Watts' convictions and conclude that the trial court was not required to merge her convictions, we must vacate the trial court's sentence with regard to restitution and credit for time served and remand this case to the trial court for correction of errors in the sentence.

When reviewing the sufficiency of the evidence,

the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.

(Citations and footnote omitted; emphasis in original.) *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SC 2781, 61 LE2d 560) (1979). So viewed, the record shows that the State's charges against Watts resulted from a physical fight between Watts and her ex-boyfriend's new girlfriend, Murphy. According to Murphy, while two women were arguing outside about whether Watts and another woman had reported the two women to the Department of Family and Children's Services, Watts came "charging down the hill" and approached one of the women "like she's about to jump on her." Murphy testified that she grabbed Watts from behind, and they "both kind of wrestled around and rolled around on the ground for a minute, and I ended up on top of her. . . ." Murphy tried to keep Watts "from jumping up or getting up," while Watts hit her repeatedly. Murphy admitted pulling off Watts' wig during this fight.

2

Murphy explained that the fight ended when "[s]omebody broke us up." She then went to a friend's nearby trailer to wash her face.

Murphy testified that when she went outside to ask for a ride home, she saw Watts "come out from standing by a truck." She explained that when a group of people outside saw Murphy, "they're all basically trying to [rev] it up again and agg[sic] it on. And then [Watts] comes up to me and is like, 'What? What you wanna do? You want some more?'"[1] Murphy explained that because Watts "hit me I don't know how many times" in the first fight and she "wasn't about to let that happen again," she hit Watts first when Watts got close enough. She denied having any weapon or rock in her hand when she hit Watts "two or three times." She then saw Watts

> messing around with her pants, and I remember her bending down like maybe she had dropped something. And when she came back up, that's when my forehead, it started bleeding and I couldn't see. So I'm thinking . . . I didn't feel anything. So I was thinking that maybe she hit me with something but I wasn't sure really what happened.

---

[1] Murphy denied yelling to Watts, "You and me, one-on-one," when she came outside looking for a ride.

Murphy tried to keep Watts at arm's length by holding onto Watt's left shoulder with her left arm because she "didn't know if she had a rock or - - I didn't know what she had." She also "kept trying to hit her and defend [her]self as best [she] could." She admitted reaching onto the ground looking for something with which to hit Watts, but claimed she found nothing but gravel and dropped it because she could not "do anything" with it. She denied hitting Watts with a rock. She described the fight as "back and forth, back and forth. So, as many as I was throwing, it was coming back at me." Until the fight was broken up, Murphy did not realize she had been cut. She admitted that she had consumed a lot of alcohol in the hours before the two fights.

Murphy was taken to the hospital where a doctor used a total of 118 external sutures and 47 staples to close her wounds. The length of Murphy's slash wounds added together totaled 83 centimeters. A forensic pathologist testified that Murphy had multiple slash wounds in the following areas: down the side of her head, through her ear and onto her neck; two-inches long on the back of her head; two-inches long on her left front shoulder; horizontal on her forehead over the right eye; on the front of her left upper arm near the elbow fold; and three very long ones going diagonally across her back. He opined that the head wounds occurred first and that the back wounds happened last. With regard to the back wounds, which were similar in length

4

and parallel to one another, he opined that Murphy would have been stationary while these "cluster" wounds were inflicted with repetitive movement "very rapidly." If she had been standing with her left arm forward while bending to the ground with her right arm, she would have been "in a proper position to receive those wounds."

The forensic pathologist also reviewed a photograph of Watts, and concluded that one of the wounds on her face could have been caused by "an instrument with something that has a linear shape to it, like a one-by-two or perhaps an edge of a brick or something like that." He testified that this injury could not have been caused by a fist because it had a pattern to it, and agreed that it would be consistent with a piece of concrete.

Watts did not testify at trial, but a police officer testified that she told him at the hospital that she had been hit in the face with a rock while trying to break up a fight. She had visible injuries on her face. In a later statement provided to police, Watts stated that Murphy initiated both fights, and she explained again that she had been hit in the face with a rock and therefore used a small razor[2] to defend herself.

---

[2] Watts stated that she worked as a cosmetologist and used the razors to trim eyebrows.

She also claimed that Murphy made statements instigating the second fight when she came out of her friend's house.

1. Watts contends that the trial court erred by failing to merge her battery and simple assault convictions, both of which were lesser-included offenses of two of the three crimes for which she was indicted.[3] The record shows that the State indicted Watts for aggravated assault because she assaulted Murphy "with a sharp object . . . which when used offensively against a person is likely to result in serious bodily injury." The aggravated battery count against her alleged that she caused bodily harm to Murphy "by seriously disfiguring her face, ear, head, neck, back, arm and chest." Based upon the serious disfigurement allegation, Watts contends that this count necessarily relates to her conduct in cutting Murphy. She asserts that the wounds were inflicted "in quick succession" and should therefore be considered one offense.

The trial court charged the jury on simple assault as a lesser-included offense of aggravated assault. OCGA § 16-5-20 (a) provides: "A person commits the offense of simple assault when he or she either: (1) Attempts to commit a violent injury to the person of another; or (2) Commits an act which places another in reasonable

---

[3] The State also indicted Watts for attempted murder, but it subsequently sought and obtained an order of nolle prosequi on this count of the indictment.

6

apprehension of immediately receiving a violent injury." The evidence here clearly would support a conviction under subsection (1). Although she did not object to any portion of the charge, Watts contends that subsection (2) cannot be used to support the jury's verdict, because Murphy testified that she did not know she had been cut until after the fight ended.

But Murphy also testified that she was bleeding so much from her forehead during the fight that she could not see and was trying to keep Watts at arm's length because she did not know if Watts was using a rock or something else to injure her. "[P]roof that the victim has been placed in apprehension of immediately receiving a violent injury need not necessarily be solely by reason of the victim's testimony of her mental state but may be inferred from the conduct of the victim such as when she retreats to secure her safety." (Citations and punctuation omitted.) *Cuzzort v. State*, 307 Ga. App. 52, 54 (1) (703 SE2d 713) (2010). Murphy's testimony that she attempted to keep Watts at arm's length after her forehead began to bleed profusely can therefore support an inference that she reasonably apprehended receiving *another* immediate violent injury. While Murphy did not know she had been cut, she certainly knew that she had been violently injured and took action to defend herself. A victim's defensive reaction can provide circumstantial evidence of a reasonable apprehension

7

of immediately receiving violent injury. *Strange v. State*, 244 Ga. App. 635, 636 (1) (535 SE2d 315) (2000) . See also *Carter v. State*, 248 Ga. App. 139, 140 (1) (546 SE2d 5) (2001).

The trial court also charged the jury on battery as a lesser-included offense of aggravated battery. OCGA § 16-5-23.1 (a) provides: "A person commits the offense of battery when he or she intentionally causes substantial physical harm or visible bodily harm to another." OCGA § 16-5-23.1 (b) defines "visible bodily harm" as "bodily harm capable of being perceived by a person other than the victim and may include, but is not limited to, substantially blackened eyes, substantially swollen lips or other facial or body parts, or substantial bruises to body parts." Here, Watts caused Murphy to have multiple, permanent scars on the different parts of her body alleged in the indictment (face, ear, head, neck, back, arm, and chest).

Based upon these lesser-included offenses for which Watts was convicted, we must determine whether the trial court erred by failing to merge them.

> Under the doctrine of merger, a criminal defendant cannot be subject to the imposition of multiple punishment when the same conduct establishes the commission of more than one crime. See OCGA § 16-1-7 (a); *Drinkard v. Walker*, 281 Ga. 211, 212-213 (636 SE2d 530) (2006). The doctrine of merger does not apply, however, if the multiple convictions are not premised upon the same conduct. See *Drinkard*, 281

8

Ga. at 212-213, 216; *McKenzie v. State*, 302 Ga. App. 538, 539 (1) (a) (691 SE2d 352) (2010); *Goss v. State*, 289 Ga. App. 734, 738 (3) (658 SE2d 168) (2008).

*Johnson v. State*, 305 Ga. App. 838, 840 (2) (700 SE2d 726) (2010). Under the "required evidence" test, "if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other." (Citations, punctuation and footnote omitted.) *Drinkard v. Walker*, supra, 281 Ga. at 215.

In this case, Watts' convictions can be sustained based upon different conduct: the first cut to Murphy's forehead caused reasonable apprehension of immediate violent injury supporting her simple assault conviction, and Murphy's remaining injuries caused by the knife wounds that followed can support a finding of visible bodily harm to support a battery conviction.[4] See *Goss*, supra, 289 Ga. App. at 738 (1) (a) Additionally, each crime requires proof of a fact that the other does not. See *Benn v. State*, 309 Ga. App. 373, 375 (2) (710 SE2d 587) (2011). The battery

---

[4] Based upon the separate proof supporting Watts' convictions under the required evidence test, the Supreme Court's "quick succession" analysis in *Culpepper v. State*, 289 Ga. 736, 738-739 (2) (a) (715 SE2d 155) (2011), does not apply in this case.

conviction requires proof of a visible bodily harm, while the simple assault conviction requires proof of reasonable apprehension of immediate violent injury.

For all of these reasons, the trial court did not err in denying Watts' request to merge these convictions.

2. We find no merit in Watts' contention that the evidence was insufficient to prove beyond a reasonable doubt that she acted in self-defense. "[T]he question of self-defense is to be determined by the jury when there is conflicting evidence on the issue." (Citation omitted.) *Campbell v. State*, 258 Ga. App. 863, 866 (575 SE2d 748) (2002). In this case, the evidence was sufficient to authorize a jury to conclude that Watts used force greater than necessary for her defense. See *Whitaker v. State*, 287 Ga. App. 465, 466 (1) (652 SE2d 568) (2007); *Fields v. State*, 285 Ga. App. 345, 346 (1) (646 SE2d 326) (2007).

3. Watts contends that the trial court erred in ordering her to pay restitution in the amount of $7,584.35 to the Crime Victim Compensation Program and $1,000 in "token" restitution to the victim because the record contains no evidence to support these awards.

The record shows that during the sentencing hearing, the State requested at the end of its argument regarding sentence: "If Your Honor is considering in any way any

kind of probation, I would ask that crime victims compensation be reimbursed. There's restitution due to medical bills for Ms. Murphy in the amount of $7,584.35." The trial court then gave Watts an opportunity to speak before announcing its sentence, which included "token restitution to the victim *or* replacement costs for victim compensation of $1,000." (Emphasis supplied.) Its written sentence stated "restitution of $7,584.35; Victim: token rest. of $1,000.00 Crime Victim Compensation Program." No evidence was introduced during the sentencing hearing to support the amount of Murphy's medical bills[5] or to show the amount of any payments made to Watts by the Crime Victims Compensation Board. On appeal, the State points to no evidence from the trial transcript supporting the trial court's restitution award.[6]

"Where a defendant appeals from an order of restitution, we determine whether the evidence was sufficient, under the preponderance of the evidence standard, to

[5] The record shows that the sentencing hearing was postponed to provide the victim with an opportunity to appear, which she declined. A written statement prepared by the victim was provided to the court, but it contained no information about any of her economic losses.

[6] As this Court has previously reminded the State in a criminal case, "this Court will not cull the record on a party's behalf." (Citations, punctuation and footnote omitted.) *Johnson v. State*, 313 Ga. App. 895, 897 n. 8 (723 SE2d 100) (2012). In this case, the trial lasted six days and the transcript alone contains 2,000 pages.

11

support that order, including the amount of restitution. [Cit.]" *Adams v. State*, 291 Ga. App. 681, 682 (662 SE2d 782) (2008), disapproved on other grounds by, *Turner v. State*, 312 Ga. App. 799, 805 n.15 (720 SE2d 264) (2011) (written findings of fact supporting restitution award no longer required for orders issued on or after July 1, 2005). In this case, the evidence was not sufficient to support the trial court's award of restitution as the State presented no evidence supporting its request for $7,584.35.[7] See *Turner*, supra, 312 Ga. App. at 803-805 (2) (state failed to demonstrate amount of restitution by a preponderance of the evidence); *Radford v. State*, 223 Ga. App. 312, 313 (2) (477 SE2d 428) (1996) (record "devoid of any evidence to support the amount of restitution ordered by the trial court"). Additionally, the record does not show that the trial court considered the factors outlined in OCGA § 17-14-10 (a) before requiring restitution as a condition of probation. See *Tobias v. State*, Ga. App. (5) (735 SE2d 113) (2012). We must therefore vacate the trial court's restitution

[7] We note that the trial court's written order on restitution could be interpreted to require that separate amounts of restitution be paid directly to the victim and the Georgia Victim Compensation Board. This written order may conflict with the trial court's oral statement in the hearing regarding the amount and to whom restitution would be made. While a trial court can order that restitution be paid to the Georgia Crime Victims Compensation Board, see OCGA § 17-14-2 (9) (B) and OCGA § 17-15-13, "a restitution order shall require that all restitution to a victim . . . under the restitution order be made before any restitution to any other person or entity under that restitution order is made." OCGA § 17-14-6 (d).

12

award and remand this case to the trial court to set an amount of restitution based upon competent evidence and the factors outlined on OCGA § 17-14-10 (a). See *Lomax v. State*, 200 Ga. App. 233, 235 (407 SE2d 462) (1991); *Slater v. State*, 209 Ga. App. 723, 726 (4) (434 SE2d 547) (1993) (no waiver resulted from defendant's failure to dispute amount of restitution ordered below).

4. Watts contends that the trial court erred in its sentence by specifying that her credit for time served would not begin until December 5, 2008, the date her probation for another offense expired. The record shows that at the time of Watts's arrest in Cherokee County on May 2, 2008, she was seven months short of completing a five-year probation period under a first offender sentence in Cobb County.[8] After her arrest in Cherokee County, she was initially denied bond by the magistrate judge. In a hearing held on July 16, 2008, the superior court judge orally granted bond to Watts, stating, "[S]o I guess I'll let you prepare the Order if you want to. If it does you any good."[9] A written order memorializing this oral finding, however, was not

---

[8] While the record shows that Cobb County put a "hold" on her following her arrest in Cherokee County, we cannot determine from the record before us the date this hold was placed, whether an arrest warrant was issued in Cobb County based upon her probation violation, or whether her probation was revoked.

[9] This is an apparent reference to the following statement by Watts' counsel: "We realize that even if she bonds out, that she would probably go to Cobb County

prepared and filed by Watts' attorney until December 5, 2008, the same day that Watts completed her probation period in Cobb County. In the motion for new trial hearing, a Cherokee County Sheriff's Office employee testified that Watts was confined in the Cherokee County jail from May 2, 2008, the date of her arrest, until December 13, 2008, when she bonded out.

Based upon the evidence in the record before us, we agree with Watts' contention that the trial court erred to the extent it specified that she was to receive "credit for time served since after [sic] December 5, 2008." "The clear policy behind OCGA §§ 17-10-9 through 17-10-12 is that time spent in incarceration under the authority of this state or a political subdivision thereof should count toward the time which a prisoner must serve." (Citation, punctuation and footnote omitted.) *Johnson v. State*, 248 Ga. App. 454, 455 (3) (546 SE2d 562) (2001).

> [U]nder OCGA § 17-10-12, the amount of credit for time spent in confinement while awaiting trial is to be computed by the convict's pre-sentence custodian, and the DOC [Department of Corrections] has the duty to award the credit for time served based upon that calculation. . . . [A] trial judge has no authority to interfere with the administrative duties of the correctional custodians and the DOC to determine and award credit for time served."

and try to resolve her case there."

14

(Citations omitted.) *Cochran v. State*, 315 Ga. App. 488, 489-490 (727 SE2d 125) (2012). We must therefore vacate this portion of Watts' sentence and remand with direction to the trial court to strike the portion of its order specifying "credit for time served since after December 5, 2008." Id. (remedy for trial court's gratuitous reference to calculation of time served is remand with direction to strike improper language from sentence).

5. Watts' remaining enumeration of error relates to the trial court's alleged mechanical sentencing scheme in the context of credit for time served, not the imposition of consecutive sentences on the two convictions before the trial court. We therefore conclude that it is rendered moot by our holding in Division 4.

*Judgment affirmed in part, vacated in part, and case remanded with direction. Doyle, P. J., and Andrews, P. J., concur.*